OPINION
Defendant-appellant Paul Fekete appeals from the March 25, 1998 judgment entry issued by Domestic Relations Judge Timothy M. Flanagan granting appellee Sharri Fekete a divorce and incorporating an Order for Shared Parenting. Fekete asserts various assignments of error challenging the distribution of marital assets, calculation of the award of both spousal and child support, and denial of Fekete's request to become the children's residential parent. Fekete also asserts that his attorney failed to assist him in presenting his case and that the judge failed to appoint an interpreter. Additionally, he asserts that a typographical error in the shared parenting plan leads to an illogical result. We agree in part and, therefore, affirm in part, reverse in part and remand.
The record reveals the following: The parties were married in Dallas, Texas on December 26, 1985, and are the parents of Brian, born December 6, 1982, Loren, born August 4, 1986, Sara, born March 5, 1989, Andrea, born August 15, 1990, and Olivia, born June 5, 1995. On October 11, 1996, Ms. Fekete filed a Complaint for Divorce alleging gross neglect of duty and adultery, in response Fekete filed a timely answer. On June 20, 1997, the judge granted Fekete's lawyers' motion to withdraw as counsel and directed that future correspondence should be forwarded to Fekete's address on Pinetree Road in Pepper Pike, Ohio.[1]
Thereafter, Fekete acted pro Se. On September 9, 1997, a trial date for February 10, 1998 was set. On October 8, 1997, Fekete filed his change of address with the court, indicating the Pinetree Road address.[2]
The parties appeared before the court on February 10, 1998 and negotiations resulted in a written agreement on the children's residency and visitation. Trial testimony was given on February 11, 12 and 17, 1998.
Mr. Fekete, 41-years-old at the time of trial, was born, raised, and educated in France. After a year in college, he played professional soccer and then turned to the fashion industry. He had been involved in the leather and fur industry for approximately 25 years and in the retail portion of the industry for ten years. At the time of trial, he worked for M. Castoria, a leather and fur business, as a sales representative. He began with the company by doing "prospection" work about eighteen months earlier. According to Mr. Fekete, the business was owned, in part, by Aileen Hayden, the woman with whom he "shares a house," Charles Abyadi, and his mother, father, sister, and a nephew — none of whom resides in this area.
Fekete is paid by Hayden in cash, sometimes by check, and he also earned commissions from other wholesalers. He testified that his 1997 income from M. Castoria, after his unemployment compensation terminated in April, totaled between $20,000 to $25,000. He earned another $2,000 to $3,000 doing repair work for the company and $6,000 to $8,000 in unemployment compensation. In 1996, he earned $38,000 and an undisclosed amount of workers' compensation benefits. In 1995 he earned about $25,000. Ms. Fekete, however, claimed that Fekete had told the children's guardian ad litem, in September 1997, that he had made $40,000 during that year.
Fekete claimed that he paid $600 per month as his share of the rent, did not pay any utility charges and did not make a car payment. He stated he drove Ms. Fekete's eleven-year old Volvo, valued at $2,000 but with $2,500 in financing outstanding. He also drove a 1995 Nissan Pathfinder titled to Hayden and Fekete's sister, Elizabeth. He claimed that all of his business travel and cellular telephone expenses were paid by Hayden and that his household goods and items of personal property had a fair market value of $3,000. With regard to outstanding debts, he testified that his mother loaned him $2,500 "for the business."
Ms. Fekete, 34-years-old at the time of trial, testified that during the marriage she occasionally repaired furs and leather for Fekete's business. After Fekete left the marital home in the summer of 1996, Ms. Fekete and her children lived on Food Stamps and AFDC, in April of 1997 she began working for Area Temps, and by June she procured a job as a receptionist with AON Risk Services where she is paid $11.20 an hour. She explained that, under her employer's health plan, she would have to pay an additional $53.09 biweekly for medical and related benefits for her children when she obtains the divorce.[3]
On the subject of marital assets, Ms. Fekete testified that Fekete had given her a lynx fur coat five or six years earlier which had been recently appraised at $25,000 but Fekete claimed it was worth $30,000. At the time of trial, she explained her former lawyers had the coat but, contrary to Fekete's assertions, she denied she gave it to them as security for her outstanding legal bill.
Ms. Fekete drove a 1994-1995 Suburban, titled in both her name and that of Ginger Tharp, a woman she claimed Fekete had been involved with when they lived in Georgia. Fekete stated, at the time the car was purchased, Tharp owned a leather business in Atlanta with his mother. Although the vehicle was allegedly purchased for use in that business, he claimed Tharp had agreed to cosign the loan application for the parties' benefit in order to obtain financing. According to Fekete, the Suburban had a value of $14,500 and an outstanding loan balance of $6,500.
Ms. Fekete admitted buying her mother a television within the last five years and giving a brother and sister a loan of an undisclosed sum of money. "[K]nowing [her] brother," she did not expect that he would pay it back. She placed a value of various household items at the time of separation at $8,000.
Fekete testified that, sometime before October 1996, he deposited a check for $30,000, money he had received in an insurance settlement, in the couple's joint account. Ms. Fekete admitted using only $3,000 of the money: $1,000 of it went to pay the private investigator, the rest went to pay the rent and support herself and the children, and approximately $50 of it covered her personal items. Fekete, however, claimed that she took $16,000 and put it into her own account, but he did not present any documentary evidence to support his testimony.
Ms. Fekete calculated her monthly family expenses at $4,504 which included $500 per month kinder-care for Olivia, $171 per month for hospitalization expenses, including expenses incurred by Brian when he was accosted on his way to school. She also claimed over $3,000 in attorney fees for her current lawyer.
The March 25, 1998 judgment entry awarded the Suburban to Ms. Fekete and the Volvo to Fekete pursuant to the parties' stipulation. The judge accepted Ms. Fekete's purported monthly expenses, noting that they "appear[ed] to be consistent with the moderate standard of living enjoyed during the marriage and the cost of caring for the minor children." He further noted that Ms. Fekete, 34 years old, had a ninth grade education with limited skills and "no opportunity for her to expand her skills due to the time required to raise and care for the five (5) minor children." On the other hand, Fekete had fewer living expenses, since they were "reduced by contributions from his employer/companion," and an income between $25,000 and $30,000, which was paid both in the form of check and cash. Because of the "limited incomes of the parties a spousal support award to the Defendant [sic] simply cannot fully meet the needs associated with maintaining herself and the minor children." In any event, the judge ordered Fekete to pay spousal support of $450 per month for six years subject to further order. The judge denied Ms. Fekete's request for attorney fees and incorporated an order for shared parenting in accordance with R.C. 3109.04 (A), (D).
Fekete appeals from this order, raising eight assignments of error.
His first assignment of error states:
 THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO CONSIDER MARITAL ASSETS THE WIFE DEPLETED IN ANTICIPATION OF LITIGATION.
Fekete argues that the judge arbitrarily ignored the "uncontroverted testimony adduced at trial that the wife depleted marital assets in anticipation of litigation;" the 1986 Dodge Aries K car given to her mother; a television given to her "brother"; an undisclosed amount of cash given to her siblings; an expenditure of $3,000; and a $25,000 lynx coat given to her former attorneys. He claims error in not charging these assets against Ms. Fekete in the property division.
Once a divorce is granted, the judge must equitably divide and distribute the marital estate between the parties and, thereafter, consider whether an award of sustenance alimony is appropriate. Holcomb v. Holcomb (1989), 44 Ohio St.3d 128, 130,541 N.E.2d 597. When dividing marital property, a judge possesses broad discretion to effect an equitable and fair property division. Gullia v. Gullia (1994), 93 Ohio App.3d 653, 663,639 N.E.2d 822, citing Worthington v. Worthington (1986), 21 Ohio St.3d 73,488 N.E.2d 150; Cherry v. Cherry (1981), 66 Ohio St.2d 348,421 N.E.2d 1293. A reviewing court should not substitute its judgment of what is "equitable and fair" for that of the trial judge unless, under the totality of the circumstances, it finds that the judge abused his discretion. Holcomb,44 Ohio St.3d at 131. "`The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable'" Id., quotingBlakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
The testimony showed that both parties gave Ms. Fekete' s mother the K car in 1994, and while Ms. Fekete admitted buying her mother a television in the last five years, nothing in the record shows that she did so "in anticipation of divorce." Nothing in the record shows either the amounts or the dates of the loans she made to her siblings, but Ms. Fekete did explain how she used the $3,000 taken from the couple's joint account. Under the totality of the circumstances, we cannot conclude that the judge abused his discretion "in failing to consider [these items as] marital assets the wife depleted in anticipation of litigation."
While Fekete testified that $16,000 disappeared from their joint account and, after searching, he discovered that it had "reappeared" in Ms. Fekete's separate account, he produced nothing to support this testimony. We again cannot conclude that the judge abused his discretion in failing to consider the "disappearance" of $16,000 as a "marital asset the wife depleted in anticipation of litigation."
On the subject of the fur coat, the judge concluded as follows:
 At the filing of this action this coat was in the possession of the Plaintiff. Plaintiff has given the coat to her prior attorneys and there is a dispute as to whether such transfer of possession was for safekeeping or as security for the payment of attorney fees. Defendant has testified that the fur has a value of approximately $30,000 and that the coat was in their possession until it could be sold. His testimony was that such coats would be brought home from his work and Defendant would have the use of such furs until they were sold. This testimony was corroborated by the testimony of the Plaintiff. It is also inconceivable that these parties could own such a coat given their limited incomes and modest lifestyles. Therefore the Court finds that such coat is not a marital asset and is the property of Defendant's employer.
While there was testimony to support the value of the coat, there is nothing in the record to support the conclusion that the coat belonged to M. Castoria, Fekete's present employer. Ms. Fekete testified that her husband gave her the coat in Georgia approximately five years earlier, before he began his employment with the company. She said that over a period of time, her husband would try to sell the coat out of his former employer's store in Georgia during the winter months. He had sold two other coats using the same method. Therefore, the lynx coat, the only asset of substantial value, should have been considered a marital asset and subject to the property division. Fekete's first assignment of error is well-taken in part.
The second assignment of error:
 THE TRIAL COURT'S FAILURE TO PROPERLY NOTICE THE HUSBAND OF THE TRIAL DATE WAS VIOLATIVE OF DUE PROCESS
Fekete asserts that he represented himself since June 1997 and, despite the fact that he properly notified the court of his change of address, both Ms. Fekete's lawyer and the court sent notices of all court dates to his former address and to his former counsel. He argues prejudice because he was unaware of the trial date, could not adequately prepare for trial and, as a result, the judge repeatedly excluded testimony of his witnesses because he did not produce their testimony during the first few days of trial.
Due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 16, Article I, Ohio Constitution, requires that every party to an action be afforded "a reasonable opportunity to be heard after a reasonable notice of such hearing." Ohio Valley Radiology Assoc., Inc. v. OhioValley Hosp. Assn. (1986), 28 Ohio St.3d 118, 125,502 N.E.2d 599. "At the very least, where actual notice is not provided, constructive notice that comes from the court's setting down the trial date upon its docket may satisfy the dictates of due process." Zashin, Rich, Sutula Monastra Co., L.P.A. v.Offenberg (1993), 90 Ohio App.3d 436, 443, 629 N.E.2d 1057, citing Ohio Valley Radiology, 28 Ohio St.3d at 124; Weaver v.Colwell Financial Corp. (1992), 73 Ohio App.3d 139,596 N.E.2d 617; State Farm Mut. Auto. Ins. Co. v.Peller (1989), 63 Ohio App.3d 357, 578 N.E.2d 874.
The docket shows that the February 10, 1998 trial date was set on September 29, 1997. Mr. Fekete told the judge during trial that he received a January 2, 1998, letter from the children'sguardian ad litem advising that hearing was scheduled for February 10, 1998. He claimed he did not know that the "hearing" would be a "trial." He admitted, however, that he looked at the court case file when he first learned in early October 1997 he was not getting any notices and, thereafter, filed his change of address letter. He further claimed that a court clerk told him the trial was to go forward on February 26, 1998.
Based upon the above, we conclude Mr. Fekete received constructive notice of the trial date in keeping with the requirements of the due process clause and, therefore, his second assignment of error is without merit.
The third assignment of error:
 THE TRIAL COURT ERRONEOUSLY FOUND THAT THE HUSBAND AGREED TO THE DIVISION OF THE COUPLE'S VEHICLES
Here Fekete argues that he wanted to purchase an appropriate car for his wife to drive the children "without a lot of impossible conditions" as incorporated into the judgment. He claims he did not agree to such a transfer of the Suburban as the judge concluded.
Regarding the Suburban, the judge concluded as follows:
 The Court further finds that the parties have agreed that the Plaintiff will waive any claim as to a support arrearage as of the start of trial, this excludes the rent payments required of the Defendant on February 15 and March 15, 1998. In exchange for such waiver[,] the Plaintiff will retain free and clear from any claim by the Defendant the 1994 Suburban automobile which has a fair market value of $14,500. The title to this vehicle is carried in the names of the Plaintiff and Defendant's friend, Ginger Tharp. Within sixty (60) days[,] the Defendant will secure Ginger Tharp's signature on a transfer of title to the Plaintiff. If Defendant is unable to provide such signature within sixty (60) days[,] the Defendant will provide the Plaintiff with a late model vehicle that is in good repair and seats six (6) people or pay to the Plaintiff $8,000. Within sixty (60) days thereafter[,] the Defendant shall sell the Suburban, pay the $6,500 lien on such vehicle and pay to the Plaintiff $8,000. If at any time prior to the transfer of the Suburban to the Plaintiff the Suburban is repossessed[,] the defendant shall provide the Plaintiff with the use of his 1986 Volvo and thirty days after such repossession shall pay to the Plaintiff $8,000 or provide her with a late model vehicle that is in good repair and seats six (6) people. Upon transfer of title to the Suburban to the Plaintiff, she shall pay and hold the Defendant harmless on the $6,500 line on such vehicle.
Fekete's argument is disingenuous because the record clearly shows that he stipulated to the foregoing. When the parties have agreed, without objection and with the judge's approval, to enter into stipulations for the record, this court will not consider objections to such stipulations on appeal. In re Annexation ofTerritory of Riveredge Tp. to City of Fairview Park, (1988),46 Ohio App.3d 29, 31, 545 N.E.2d 1287, motion to certify overruled38 Ohio St.3d 703, 532 N.E.2d 1316-1322. This assignment is overruled.
The fourth assignment of error:
 WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO ASSIST A PRO SE LITIGANT WHO HAD DIFFICULTY SPEAKING AND UNDERSTANDING THE ENGLISH LANGUAGE.
Fekete argues that the judge ran afoul of the Ohio Code of Professional Responsibility, E.C. 2-3, when he failed to assist him in presenting his defense and further erred when he failed to appoint an interpreter to help him "understand and communicate" as required by R.C. 2311.14 (A).
The judge noted the following in his opinion and order:
 The Court further finds that the trial of this matter proved difficult due to the Defendant's election to represent himself. This is growing trend which this and other Courts must deal with in the future. Given a pro se litigant's lack of training in the law and the procedures used at trial, courts must face difficult decisions as to how to proceed with such trials. Initially a court must decide whether to elect to completely disregard the Ohio Rules of Civil Procedure and the Ohio Rules of Evidence and permit the unrepresented litigants to simply state anything they believe to be important and to present documents by just giving them to the judge. As an example, in this matter the Defendant elected not to offer testimony or documents as to his living expenses during his narrative testimony. Instead, a list of his current expenses was attempted to be used as he cross-examined his wife. If procedures and evidentiary rules are to be used in trial this document and inquiry cannot be permitted and it wasn't in this case. To rule otherwise would create two types of trials, those with attorneys where mandatory procedures are followed, and uncontrolled free-for-alls where pro se litigants say and do anything they feel is important to their cases. The second alternative available to the trier of fact is to assist the pro se litigant in presenting evidence by conducting extensive inquiry of witnesses and requesting documents which might support this testimony. Unfortunately this approach to trial would require that the trier of fact also be the attorney the unrepresented litigant and thus destroy the concept of the independent trier of fact which is the foundation of our legal system. The only other alternative is to fully enforce the mandatory evidentiary and procedural rules and leave unrepresented litigants to the often harsh consequences of their voluntary choice to enter trial without the benefit of counsel. While this is not a desirable choice, it is the only choice which maintains the concept of an independent judiciary.
Fekete's arguments lack merit. That portion of Ethical Consideration 2-3 upon which he relies in support of this error provides that "[t]he giving of advice that one should take legal action could well be in fulfillment of the duty of the legal profession to assist laymen in recognizing legal problems."[4]
It notes, however, that such "advice is proper only if motivated by a desire to protect one who does not recognize that he may have legal problems or who is ignorant of his legal rights or obligations." It is improper to volunteer legal advice "if motivated by a desire to obtain personal benefit, secure personal publicity, or cause litigation to be brought merely to harass or injure another."
Initially it should be noted that the Code of Professional Responsibility governs the conduct of lawyers in their relationship with the public while the Code of Judicial Conduct sets forth standards of ethical conduct of judges. To construe an Ethical Consideration to obligate a trial judge to assist a litigant in presenting his claim or defense not only misinterprets its intent but would cause that judge to violate the clear mandate in Canon 3 of the Code of Judicial Conduct to "perform the duties of judicial office impartially and diligently." The judge did not abuse his discretion by failing to assist Fekete in presenting his case.
We find no support in the record for Mr. Fekete's additional assertion that the judge erred by failing to appoint a French-English interpreter. Section 2311.14 (A) of the Ohio Revised Code provides that "[w]henever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." Contrary to his assertion, it is clear from the record that Fekete clearly understood the proceedings and communicated with the judge. The record shows he understood the testimony, made appropriate objections, and conducted an effective cross-examination. Therefore, we cannot find error in failing to appoint an interpreter. The fourth assignment of error is overruled.
The fifth assignment of error:
 THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO ALLOW THE FATHER TO BECOME THE CHILDREN'S RESIDENTIAL PARENT DUE TO HIS FAILURE TO TIMELY COMPLETE THE MANDATORY PARENTING CLASS.
Fekete argues that the judge improperly deprived him of the opportunity to become the residential parent because R.C.3109.053 does not authorize a judge to consider timely parenting class attendance as the definitive factor in determining a party's parental rights and responsibilities.
Fekete misrepresents the record. Before the start of trial on February 11th, the judge noted that the parties had begun negotiations on February 10th and signed their agreement to a Shared Parenting Plan that had been recommended by the children'sguardian ad litem. The Plan provided that Ms. Fekete would be the residential parent and legal custodian "except Fekete should be designated the residential parent of Loren for schoolplacement purposes only." (Emphasis added.) The judge noted that Fekete had not completed the mandatory parenting education seminar and indicated that "because of that and pursuant to the rules, the Court finds that the agreement that was reached yesterday is not in the best interests of the children and will not award Shared Parenting." The judge indicated that, if the parties agreed, he would grant sole custody to Ms. Fekete with visitation provisions as contained in the proposed agreement. After the judge made some clarification, Fekete asked whether he could "still take that class." The judge said that Mr. Fekete could seek "a modification back to the Shared Parenting" upon completion of the class. Fekete responded: "I understand, yes, it is acceptable." The judge then found that the parties stipulated that Ms. Fekete would be the "residential parent pursuant to the visitation and parenting provisions contained in the letter ofthe Guardian Ad Litem * * * dated February 9, 1998 and signed by the parties." Like the original agreement, the March 25, 1998 order specifically indicated that Fekete would be considered the residential parent of Loren, "for school placement purposes only." The order also includes a copy of Mr. Fekete's certificate of attendance for the parent education seminar attended on February 19, 1998.
Mr. Fekete not only failed to object to the disposition of Loren's residency, he clearly agreed to residency of the children and Loren as provided in the guardian ad litem's February 9 letter. Mr. Fekete also clearly conceded to the judge's ruling regarding residency, subject to his future request for modification upon completion of the parenting course. We find, therefore, that Mr. Fekete has waived this assignment of error for our review. In re Annexation of Territory of Riveredge Twp.,46 Ohio App.3d at 31.
The sixth assignment of error:
 THE COURT IMPROPERLY CALCULATED AN INEQUITABLE AWARD OF SPOUSAL SUPPORT.
Fekete argues that a six-year, $450 per month spousal support order based upon an income of $30,000 is inequitable, because the uncontroverted evidence showed that Ms. Fekete earns almost $24,000 annually while his yearly income falls between $20,000 and $25,000. He further claims the judge failed to address the parties' retirement benefits, the total comparative assets and liabilities, tax consequences, lost wages, and his expenses.
Fekete again misrepresents testimony. When he testified that he was paid between $20,000 and $25,000 for the 1997 fiscal year, he also claimed he made between $2,000 and $3,000 in repair work and an additional $6,000 to $8,000 in unemployment compensation benefits. A day earlier, he testified that he made between $25,000 and $30,000 during 1997, and the judge adopted this testimony to support the award of spousal support. The record, therefore, fully supports the conclusion that Fekete earned between $25,000 and $30,000 per year as it comports with his own testimony.
We will, however, remand the determination of spousal support for reconsideration in light of our holding that the lynx coat was a marital asset and our remand for distribution of that asset.
The seventh assignment of error:
THE TRIAL COURT ERRED IN ITS CALCULATION OF CHILD SUPPORT.
Fekete again suggests that by inaccurately determining his income, the judge incorrectly calculated his child support obligation and, additionally, failed to credit him for his full-time care of the children and financing their summer educations.
As previously noted, Fekete's testimony clearly supports an annual imputed income of $30,000. In addition, while he claims that the judge should have given him credit for summer education expenditures, he failed to produce any evidence showing that he paid or planned to pay such costs. He attempted to introduce certain evidence of various expenditures through his cross-examination of Ms. Fekete, but she denied knowing what amounts he may have independently paid on behalf of the children.
In any event, the child support computation worksheet does not reflect the summer visitation schedule where, pursuant to part II (c) of the shared parenting plan, Mr. Fekete would have visitation from Monday through Friday of each week. Therefore, we remand for recalculation of the child support obligation.
The eighth assignment of error:
 SECTION II (d)(i) OF THE SHARED PARENTING PLAN CONTAINS AN ERROR.
Fekete claims a typographical error creates an illogical requirement:
 Father's choice of vacation has priority over Mother's choice, unless the Father's vacation is an annual mandatory shut-down of the place of employment. [Emphasis added.]
We agree. The italicized portion above should read "Mother's vacation." Therefore, we also remand for correction of the judgment.
In accordance with the foregoing, we affirm in part, reverse in part and remand as to the following: (1) for consideration and distribution of the lynx coat as a marital asset; (2) for reconsideration of the amount of spousal support in light of the distribution of the lynx coat; (3) for recalculation of the child support obligation; and (4) for correction of the March 25, 1998 judgment entry as addressed in the eighth assignment of error.
It is ordered that the parties share equally the costs costs herein taxed.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Division of Domestic Relations to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 __________________________ JUDGE ANNE L. KILBANE
 JOHN T. PATTON. P.J., CONCURS:
 KENNETH A. ROCCO. J., CONCURRING IN PART AND DISSENTING IN PART.
[1] Nevertheless, the Clerk of Courts directed correspondence to Fekete's Lyndhurst address listed on the complaint.
[2] On September 23, 1997, after a hearing, the magistrate issued a decision and interim order that recommended that Mrs. Fekete's June 13, 1997 motion for order to show cause be granted. On December 26, 1997, the judge adopted the magistrate's interim order as a final order, overruling Fekete's October 22, 1997 objections. On October 22, 1997, Mr. Fekete filed a notice of appeal to this court. That appeal was dismissed sua sponte on January 29, 1998 for failure to file the record.
[3] She testified that the cost of coverage for a single person would be $26.53; coverage for the family would total $79.61 per pay period.
[4] While Canons "are statements of axiomatic norms" expressed in general terms, Ethical Considerations are "aspirational in character and represent the objective toward which every member of the profession should strive." Ohio Code of Professional Responsibility, Preface. Canon 2 of the Ohio Code of Professional Responsibility provides that "[a] lawyer should assist the legal profession in fulfilling its duty to make legal counsel available."